**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al*.,[1] | Case No. 25-12055 (BLS) |
| Debtors. | (Jointly Administered) |
| LUGANO DIAMONDS & JEWELRY INC. | |
| Plaintiff, | Adv. Proc. No. 26-_____ (BLS) |
| v. | |
| MORDECHAI FERDER, an individual acting on his own behalf, and in his capacity as Trustee of the Haim Family Trust; | |
| Defendant. | |

**COMPLAINT AND OBJECTION TO PROOF OF CLAIM**

Debtor, Lugano Diamonds & Jewelry Inc., ("Debtor" or "Lugano"), acting through the

Special Committee of Lugano's Board of Directors, by and through its undersigned counsel,

hereby files this Complaint against Defendant Mordechai Ferder ("Moti"), individually and in his

capacity as trustee of the Haim Family Trust (the "Haim Family Trust"), and states as follows:

**PRELIMINARY STATEMENT**

1.      Lugano, together with its affiliated entities that are debtors and

debtors-in-possession in the chapter 11 cases to which this Adversary Proceeding relates

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

(collectively, the "Debtors") were throughout their twenty-year history a renowned designer, manufacturer, and retailer of high-end diamonds and jewelry. The Debtors sell diamonds, other precious stones, and high-end jewelry directly to clients around the world. The Debtors built a strong global reputation for selling unique pieces and for fostering strong, lasting relationships with their many clients and the communities in which they operate. From the Debtors' founding in 2005, their business grew rapidly on the back of their robust retail operations, expanding from a single boutique in Newport Beach, California to multiple boutiques throughout the United States and a boutique in London, staffed by over 150 employees.

2.      Through this Complaint, Lugano asserts that Moti, the former Chief Executive Officer of Lugano and its parent Lugano Holding, Inc. ("Lugano Holding"), as well as an officer and director of the other Debtors, conspired to engage in fraudulent schemes outside of the Debtors' legitimate business to steal millions of dollars from the Debtors and expose the Debtors to significant potential liabilities and reputational harm. Among other things, Moti concealed and misrepresented the nature of numerous purported financing transactions he entered into with third-party, high-net-worth individuals (the "Outside Contracts"). By their terms, the Outside Contracts created potential liabilities for Lugano, but Moti disguised them as direct sales. Moti also misappropriated Lugano funds to repay some of the Outside Contracts by concealing the repayments as legitimate business expenses and vendor payments.

3.      In addition, the fraudulent scheme involved: (1) creating fictitious sales via forged sales documentation; (2) inventing sham "Barter Exchanges" in which Lugano customers allegedly brought in jewelry that was purchased by Lugano or a Lugano vendor to reduce phantom accounts receivable and inflate Lugano's assets; (3) pushing for inventory acquisition and using so-called "Purchase Deposits" to fraudulently transfer funds or manipulate accounting records through

2

roundtrip transactions; (4) bypassing inventory audit by claiming selected stones were being held on consignment; and (5) falsifying shipment records to include empty shipment boxes, shipments to unrelated, public addresses, and apparent recycling or faking of shipping and receiving records. Moti lied to the Debtors' officers, directors, and employees to perpetuate his scheme and avoid detection.  Moti's scheme has potentially exposed Lugano to over $100 million in liability.

4.      Moti also stole millions more from Lugano by authorizing fraudulent wire transfers to the Haim Family Trust—for which he served as trustee—while putting false beneficiary information in the wire transfer documents.

5.      When the Debtors and Compass Group Diversified Holdings LLC ("Compass"), Lugano's majority shareholder, discovered accounting discrepancies resulting from Moti's scheme, Moti resigned his various positions with the Debtors.  He is believed to be currently staying in Tel Aviv, Israel, and has moved assets, some belonging to the Debtors' chapter 11 estates (the "Estates") out of the United States. He has also sold assets, some of which may have belonged to the Debtors, in the United States and funneled the money out of the United States and to Israel.

6.      On November 16, 2026 (the "Petition Date"), the Debtors' mounting liabilities caused by Moti's fraudulent scheme, caused the Debtors to file voluntary petitions (the "Chapter 11 Cases") under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code"). The Chapter 11 Cases have been jointly administered under the above-captioned chapter 11 case. The Chapter 11 Cases remain pending.

7.      Through this Adversary Proceeding, Lugano seeks to hold Moti responsible for the substantial harm he has caused the Debtors and the Estates through his fraudulent activities and to

disallow the approximately $36 million (plus alleged unliquidated amounts) proof of claim that Moti has filed in Lugano's chapter 11 case.

## PARTIES

8.    Plaintiff Lugano is, and at all times mentioned herein was, a California corporation with its principal place of business in Newport Beach, California.  Lugano is a debtor and debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

9.    Defendant Moti is an individual residing in Corona del Mar, California, although he appears to have relocated to Israel. (See "Lugano Diamonds: Latest Bankruptcy Status After Sale," EvenFlo Editors, https://elevenflo.com/blog/lugano-diamonds-chapter-11-fraud-bankruptcy.)

10.    Defendant Haim Family Trust, of which Moti is trustee, is and at all times mentioned herein was, a trust with its principal residence in Corona del Mar, California.

## JURISDICTION AND VENUE

11.    This Adversary Proceeding, the claims herein, and the objections to Moti's proof of claim as set forth herein are brought pursuant to 28 U.S.C. § 2201, sections 502, 510, 544, 547, 548, 550, 551, and 558 of the Bankruptcy Code, and Rules 3001, 3007(b), and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

12.    This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157, 1331, and 1334, as the claims and objections asserted herein arise in the Chapter 11 Cases. This is a core proceeding pursuant to 28 U.S.C. § 157.

13.    Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4

**GENERAL ALLEGATIONS**

### A. Moti Serves as CEO of Lugano and Lugano Holding and an Officer and Director of Numerous Debtors.

14.     Prior to the Petition Date, the Debtors enjoyed success selling one-of-a-kind jewelry to wealthy clientele and partnering with organizations to host and sponsor equestrian, social, and philanthropic events.  The Debtors' businesses began in 2005 with a single store in Newport Beach, California.  They operated a robust retail business selling unique diamonds, other precious stones, and high-end jewelry directly to clients all over the world.  Many of the Debtors' clients were loyal customers for years and acquired several valuable items from the Debtors.

15.     At their height and prior to the Petition Date, the Debtors operated boutiques in California, Colorado, Connecticut, Florida, Illinois, Washington, D.C., and London.  In addition, they sourced unique stones for clients from all over the world.  As of the Petition Date, Lugano employed approximately 120 employees.

16.     In 2021, Compass Diversified Holdings and Compass, through an intermediate subsidiary, acquired an indirect majority ownership stake in Lugano from Moti and affiliated entities based upon an enterprise value of $256 million.  As part of that transaction, Lugano entered into a Credit Agreement with Compass (the "Credit Agreement") and agreed not to procure outside investments or financing without Compass' approval.  Moti was closely involved with Lugano's acquisition by Compass and had actual knowledge of this agreement.

17.     Up until his resignation in May 2025, Moti served as Chief Executive Officer of Lugano and Lugano Holding, as well as in various officer and director roles with the other Debtors. He was closely involved with customer and vendor relationships and avoided communicating with third parties through his company accounts, communicating instead through personal emails and text messages.

**B. Moti Enters into Outside Contracts with Third Parties and Conceals the Nature of these Outside Contracts in Lugano's Books by Forging Documents and Sending Sham Shipments.**

18.     Moti grew dissatisfied with Lugano's retail business and sought to enrich himself through other schemes.

19.     Notwithstanding the Credit Agreement with Compass, Moti entered into numerous unauthorized transactions (the Outside Contracts) with high-net-worth individuals in California, Florida, and other states, outside of Lugano's ordinary retail business.

20.     Although the specific terms of each of these Outside Contracts varied, they generally adhered to a common scheme orchestrated by Moti:

a.     Moti represented to the third party that Lugano already owned or intended to acquire a specific diamond—purportedly verified by a unique identification number—and expected to sell it at a significant profit.

b.     Moti proposed that Lugano and the third party each would contribute a percentage of the purchase price or that the third party could purchase a percentage interest in the diamond purportedly already owned by Lugano.

c.     Moti further represented that the anticipated profits from the sale of the diamond would be shared pro rata with the third party.

d.     Alternatively, if the third party chose not to wait for resale, Moti promised that Lugano would return the third party's funds, plus a guaranteed—and substantially above market—interest rate.

21.     In many cases, however, there was no actual diamond that was the subject of the Outside Contracts.  In still other cases, Moti entered into multiple Outside Contracts that purported to sell an interest in the same diamond to multiple counterparties.

6

22.     Moti deliberately concealed the true nature of the Outside Contracts from the Debtors by disguising them as part of the Debtors' robust, legitimate retail business.

23.     Moti falsely claimed to the Debtors' personnel that these were ordinary sales— transactions in which Lugano sold diamonds outright to third parties.  These representations were false.

24.     Moti then manipulated Lugano's internal accounting records to characterize the incoming funds as revenue rather than liabilities, thus obscuring the repayment obligations under the Outside Contracts.  By doing so, Moti misled internal stakeholders regarding the Debtors' actual performance and valuation, in addition to creating debt for the Debtors that internal stakeholders were not aware of.

25.     To sustain the illusion that the Outside Contracts were in fact legitimate diamond sales, Moti forged invoices and other documentation purporting to evidence arms-length transactions.

26.     In some cases, Moti arranged for empty boxes to be shipped to addresses across the United States, including, for example, to Montana, so that he could point to shipping records as false proof that the transactions were legitimate diamond sales that had been fulfilled.  These fictitious documents and shipping records were then presented as legitimate proof of sales, when they were in fact manufactured to complete the illusion of the sales.

27.     Moti could (and would) also obtain and replace diamonds and other jewelry in the Debtors' inventory, thereby creating the false impression that the Debtors had possession of items that they did not actually possess.

28.     During the time Moti carried out this scheme, Compass retained an outside audit firm ("Auditor") to conduct an audit in preparation for the issuance of required SEC filings by

7

Compass.  Lugano additionally had an agreement with the Auditor for audit services.  The Auditor's audits failed to detect crucial evidence of fraud.

29.     Moti used the Debtors' funds to repay some of the third parties to the Outside Contracts.  In at least some instances, Moti concealed these outgoing repayments to the third parties as payments to vendors.

30.     Moti did not repay all the third-party investors, which potentially exposed the Debtors to over $100 million in liability.  Prior to the Petition Date, several third parties sued Lugano in relation to the Outside Contracts.  Subsequently, a number of third parties alleging they had been parties to Outside Contracts filed proofs of claim in the Chapter 11 Cases.  These proofs of claim collectively assert claims with a face amount of over $160,000,000, according to the Debtors' preliminary estimate.

### C. Moti's Fraudulent Schemes

31.     Separate from the Outside Contracts, Moti also engaged in other fraudulent schemes to manipulate Lugano's accounting records and financial results.

32.     Specifically, Moti manufactured multiple round-tripping transactions, where purchase deposit wires would leave Lugano and nearly identical amounts would return as payments against phantom accounts receivable, with little or no real inventory changing hands.

33.     Likewise, Moti used complicit third-party vendors to fabricate phantom exchange transactions, where sales credits or payments to certain clients were effectively facilitated by alleged third-party vendors with overlapping relationships.

34.     In executing these fraudulent schemes, Moti forged numerous customer signatures on Lugano invoices and manipulated shipping records to simulate actual sales volumes.

**D. Moti Embezzles Millions of Dollars from Lugano and Directs it to the Haim Family Trust.**

35. Separate from the Outside Contracts, Moti also embezzled millions of dollars from Lugano.

36. Moti used his position as CEO to authorize wire transfers from Lugano bank accounts to a bank account belonging to the Haim Family Trust, for which Moti serves as trustee.

37. Moti concealed the recipient of these wire transfers by designating a different entity as the beneficiary on the documentation for the wire transfer.  For example, Moti caused "Charles Schwab & Co. Inc." to be listed as the beneficiary for certain wires but the bank account information on those wires confirms that these went to bank accounts belonging to the Haim Family Trust.

38. Between January and February 2024, Moti engaged in at least four of these fraudulent wire transfers totaling at least a net amount of $2.1 million—and over a longer period of time as much as nearly $4 million. **Exhibit C.**

39. The full extent of Moti's embezzlement is still under investigation by, upon information and belief, the SEC and the FBI.

**E. Moti Resigns and Begins Moving Assets Out of the Country.**

40. In or around April 2025, accounting discrepancies resulting from Moti's scheme were identified, which prompted an investigation by the Debtors and Compass into the Debtors' accounts and Moti's actions.

41. At the time, Moti was in Tel Aviv, Israel.  Faced with the prospect of the full depth of his fraudulent activities coming to light and being terminated for cause, Moti chose to resign as CEO of Lugano and Lugano Holding, and from all offices and directorships he previously held

with the Debtors, in May 2025.  Since then, he has remained in Tel Aviv and has not returned to the United States.

42.     On information and belief, Moti has transferred valuable assets, including artwork, cars, and other valuable items, some of which belong to the Estates, from his residence in California to Tel Aviv, presumably to remove those assets from the jurisdiction of courts in the United States.

43.     On June 17, 2025, Moti sold his California residence to Serenade Newport, LLC ("Serenade Newport"), a California limited liability company that he had formed on June 13, 2025, apparently for the sole purpose of effectuating that transaction.

44.     Upon information and belief, Moti sold his residence for about $7 million, which is less than its market value of about $9 million.

45.     Upon information and belief, Moti sold his California residence for less than market value because he wanted to quickly liquidate his assets and move the money out of the United States.

**F.  Pre-petition Transfers to Moti**.

46.     In the year preceding the Petition Date, Lugano transferred Moti a total of at least $1,083,477.28 in thirty-five (35) separate transfers.  Such transfers are detailed on **Exhibit A** hereto.

**G.  Moti's Proof of Claim**

47.     On January 27, 2026, Moti, on behalf of himself and as trustee to the Haim Family Trust, filed an unsecured claim against Lugano in the amount of $36,024,500 (the "Claim").  A

true and correct copy of the Claim is attached hereto as **Exhibit B**.  The Claim has been assigned claim number 160 by the Debtors' claims agent.

48.     The components of the Claim are as follows:

a.      Funds Paid By Claimant on Contracts that Lugano was Obligated to Pay;

b.      Funds Paid By Claimant to Cover Lugano Business Expenses;

c.      Labor Code Violations and Wrongful Termination;

d.      Indemnity Claims Resulting from Actions Brought by Diamond Contractors Against Ferder;

e.      Set off and Recoupment Claims;

f.      Claims of Interest.

49.     As part of the Claim, Moti alleges that he was forced to resign under duress and therefore was effectively terminated by Lugano to make him a scapegoat related to the Outside Contracts and to conceal Lugano's and Compass' own breaches of fiduciary duty and securities law violations.  The Claim does not provide any evidentiary support or even concrete factual allegations to support these allegations.

50.     While the Claim includes certain supporting documentation, such as a copy of Moti's alleged employment contract, and attaches unverified lists of certain payments alleged to have been made by Moti that comprise a portion of the Claim, the Claim does not otherwise provide any evidence or support for the alleged components of the amount claimed.

## COUNT I

## OBJECTION TO ALLOWANCE OF CLAIMS BASED ON FAILURE TO PROVIDE INFORMATION OR DOCUMENTS SUFFICIENT TO CONSTITUTE PRIMA FACIE EVIDENCE OF VALIDITY AND AMOUNT THEREOF
## (11 U.S.C. § 502; Fed. R. Bankr. P. 3001(f))

51.     Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

52.     The Claim consists only of several conclusory sets of allegations respecting Lugano, without meaningful evidentiary support.

53.     Specifically, the Claim seeks payment of $6.4 million in amounts alleged by Moti to have been paid by him under certain of the Outside Contracts.  The Claim does not identify the relevant contracts, the amounts alleged to have been paid by Moti thereunder, the circumstances entitling Moti to such payments, or the basis for any payments in light of Moti's extensive fraud respecting such Outside Contracts.

54.     Moti further alleges that he made payments to various parties "from his own personal funds totaling $29,624,500…." While Moti provides lists of dates and amounts alleged to comprise such payments, the Claim provides no direct evidence of any such payments, nor does it provide any factual basis on which to conclude that such amounts were properly payable by Lugano.

55.     Moti additionally alleges certain California employment law claims and indemnity claims in the Claim. Such claims consist only of conclusory allegations of a right to payment.

56.     Moti also alleges various unidentified setoff and recoupment claims and a "claim of interest in Lugano," for which neither support nor even an explanatory definition are provided.

57.     Lugano's books and records do not, following a reasonable review, provide a basis for Moti's claims—much less support a claim that any amounts he contributed should be considered debt in these proceedings.

58.     Moti's Claim fails to provide adequate informational and documentary support to demonstrate a right to payment in accordance with section 502 of the Bankruptcy Code and Bankruptcy Rule 3001(f).  The Claim should accordingly be disallowed.

59.     Lugano reserves any and all other defenses and rights to objection to the Claim on any other grounds.

## COUNT II

### EQUITABLE SUBORDINATION OF CLAIMS
### PURSUANT TO 11 U.S.C. § 510(c)

60.     Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

61.     As set forth above, Moti engaged in numerous actions that individually and collectively operated to defraud Lugano, mismanage Lugano's affairs while seeking to enrich Moti personally, and obtain possession and control over funds and other property belonging to Lugano.

62.     To enrich himself, Moti fraudulently and inequitably depleted Lugano's assets available to pay the claims of Lugano's legitimate creditors, thereby injuring Lugano, its creditors, and its other stakeholders.

63.     As a result of Moti's actions, the Claim, to the extent not otherwise disallowed, should be equitably subordinated to the claims of Lugano's general unsecured creditors pursuant to section 510(c) of the Bankruptcy Code.

## COUNT III

**OBJECTION TO ALLOWANCE OF CLAIMS DUE TO PENDING AVOIDANCE ACTIONS PURSUANT TO 11 U.S.C. § 502(d)**

64.     Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

65.     Pursuant to section 502(d) of the Bankruptcy Code, the court "shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of an avoidable transfer, unless such entity or transferee has paid the amount for which it is liable.

66.     Lugano is entitled to recover various property from Moti as set forth herein. Lugano also made numerous transfers to or for the benefit of Moti prior to the Petition Date that may be recovered from Moti, including (a) the transfers set forth on **Exhibit A** hereto, (b) the Trust Avoidable Transfers described in Count VIII of this Complaint, and (c) additional transfers that may be identified by the Debtors in their ongoing investigation, and that Moti has not paid or turned over to Lugano.

67.     Pursuant to section 502(d) of the Bankruptcy Code, the Claim should be disallowed until such time as Moti pays the amounts and returns the property for which he is liable to Lugano for under applicable provisions of the Bankruptcy Code.

## COUNT IV

**OBJECTION TO ALLOWANCE OF CLAIMS BECAUSE THE VALUE OF THE CLAIM EXCEEDS THE REASONABLE VALUE OF MOTI'S SERVICES (11 U.S.C. § 502(b)(4))**

68.     Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

69.     Pursuant to section 502(b)(4) of the Bankruptcy Code, a claim shall be disallowed "if such claim is for services of an insider…of the debtor" and such claim exceeds the reasonable value of such services.

70.     At all times relevant to the Claim, Moti was an insider of Lugano as defined in section 101(31)(B) of the Bankruptcy Code.

71.     To the extent any portion of the Claim is for Moti's services to Lugano, the reasonable value of such services was, in light of the extensive fraud and other misconduct engaged in by Moti, negligible or even negative.

72.     To the extent any portion of the Claim is for Moti's services to Lugano, the value of his claims accordingly exceeds the value of his services and should be disallowed.

## COUNT V

### OBJECTION TO PAYMENT OF CLAIMS BASED ON
### RIGHTS OF SETOFF AND/OR RECOUPMENT (11 U.S.C. § 558)

73.     Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

74.     To the extent the Claim may be allowed notwithstanding the facts and circumstances set forth herein, Lugano asserts a right of setoff as a defense to payment of such claims under section 558 of the Bankruptcy Code against amounts owed by Moti to Lugano.

75.     To the extent the Claim may be allowed notwithstanding the facts and circumstances set forth herein, and to the extent any such claims arise out of the same transaction with Lugano as any amounts owed by Moti to Lugano, Lugano additionally asserts a right of recoupment with respect to all such amounts.

## COUNT VI

### AVOIDANCE AND RECOVERY OF PREFERENCES
### (11 U.S.C. §§ 547, 550, and 551)

76. Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

77. In the one year preceding the Petition Date, Lugano made transfers totaling $155,253.49 to Moti (the "Pre-Petition Transfers"). A true and correct list of the Pre-Petition Transfers is attached hereto as **Exhibit A**.

78. Each Pre-Petition Transfer was a transfer of interests of Lugano in property made to or for the benefit of a creditor.

79. Each Pre-Petition Transfer was made on account of the antecedent debt owed by Lugano before each Transfer was made.

80. Each Pre-Petition Transfer was made while Lugano was insolvent.

81. Each Pre-Petition Transfer was made on or within the year before the Petition Date.

82. At the time of the Pre-Petition Transfers, Moti was an insider of Lugano, as defined in section 101(31)(B) of the Bankruptcy Code.

83. Each Pre-Petition Transfer, if not avoided, would enable Moti to receive more than he would receive if (i) the case was one under chapter 7 of the Bankruptcy Code; (ii) the Pre-Petition Transfer had not been made; and (iii) Moti received payment of such debt to the extent allowable under the Bankruptcy Code.

84. Each Pre-Petition Transfer is voidable by Lugano as a preference pursuant to Section 547 of the Bankruptcy Code, which Lugano may avoid and recover pursuant to Sections 550 and 551 of the Bankruptcy Code.

85.     Moti was the initial transferee of each Pre-Petition Transfer or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Pre-Petition Transfers were made.

86.     Pursuant to Section 550(a) of the Bankruptcy Code, Moti must return the value of each Pre-Petition Transfer to Lugano.

## COUNT VII

### AVOIDANCE OF FRAUDULENT TRANSFERS
### (11 U.S.C. §§ 548(a)(1)(B) and 550)

87.     Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

88.     In the four years prior to the Petition Date, Moti caused Lugano to make transfers to or for the benefit of Moti in an amount not less than $1,083,477.28 (the "Moti Avoidable Transfers"). *See* **Exhibit C**.

89.     At the time of all the Moti Avoidable Transfers, Moti was an insider of Lugano.

90.     Lugano was insolvent at the time of each of the Moti Avoidable Transfers or the Moti Avoidable Transfers caused Lugano to become insolvent.

91.     Lugano did not receive reasonably equivalent value in exchange for each of the Moti Avoidable Transfers.

92.     The Moti Avoidable Transfers were made to or for the benefit of Moti and constitute avoidable transfers under 11 U.S.C. §§ 548(a)(1)(B) that are recoverable by Lugano under 11 U.S.C.§ 550.

## COUNT VIII

**AVOIDANCE OF FRAUDULENT TRANSFERS
AGAINST BOTH DEFENDANTS
(11 U.S.C. 548(a)(1)(A) and 550)**

93.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

94.    In the four years prior to the Petition Date, Moti caused Lugano to make transfers to or for the benefit of the Haim Family Trust in an amount not less than $2.1 million but, it appears, as much as $3.9 million (the "Trust Avoidable Transfers"), **Exhibit C**.

95.    Moti misrepresented the beneficiaries on the documentation accompanying the wire transfers to prevent Lugano from realizing that these were not legitimate business expenditures.

96.    Lugano was insolvent at the time of each of the Trust Avoidable Transfers or the Trust Avoidable Transfers caused Lugano to become insolvent.

97.    Lugano did not receive reasonably equivalent value in exchange for each of the Trust Avoidable Transfers.

98.    The Trust Avoidable Transfers were made with the actual intent to hinder, delay, or defraud Lugano's creditors.

99.    The Trust Avoidable Transfers were made to or for the benefit of the Haim Family Trust and constitute avoidable transfers under 11 U.S.C. §§ 548(a)(1)(A) and 550.

100.    The Trust Avoidable Transfers were made for the benefit of Moti and constitute avoidable transfers under 11 U.S.C. §§ 548(a)(1)(A) that are recoverable by Lugano under 11 U.S.C. § 550.

18

## COUNT IX

### VOIDABLE TRANSFER – ACTUAL FRAUD
### (11 U.S.C. §§ 544, 550 and Cal. Civil Code § 3439 *et seq.*)

101.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

102.    Lugano has a right to payment from Moti arising from Lugano's claims against Moti in this action.

103.    Moti was aware that his schemes were on the cusp of being discovered and knew that he would be liable to Lugano and others for millions of dollars.

104.    On or about June 17, 2025, Moti sold his California residence, located at 1501 Serenade Terrace, Corona del Mar, California 92625, to Serenade Newport for about $7 million, which is less than its fair market value of $9 million.

105.    Moti sold his California residence for less than its fair market value because he had fled the United States to Israel and wanted to liquidate his assets and then transfer the proceeds from the sale out of the country as well.

106.    Moti sold his California residence and transferred the proceeds to Israel with the specific intent to hinder, delay, or defraud his creditors.

107.    Lugano is harmed because Moti does not have sufficient assets in the United States to satisfy his obligations to Lugano in full.

108.    Moti's conduct was a substantial factor in causing Lugano's harm.

109.    Pursuant to Section 550(a) of the Bankruptcy Code and applicable California law, Moti must return the value of the Serenade Newport property.

## COUNT X

### VOIDABLE TRANSFER – CONSTRUCTIVE FRAUD
### (11 U.S.C. §§ 544, 550 and Cal. Civil Code § 3439)

110.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

111.    Lugano has a right to payment from Moti arising from Lugano's claims against Moti in this action.

112.    On or about June 17, 2025, Moti sold his residence, located at 1501 Serenade Terrace, Corona del Mar, California 92625, to Serenade Newport for about $7 million, which is less than its fair market value of $9 million.

113.    Moti did not receive reasonably equivalent value in exchange for the sale of the Corona del Mar residence because the sale was for substantially less than the fair market value of the property.

114.    At the time of the sale of the Corona del Mar residence, the sum of Moti's debts was greater than the sum of his assets, or Moti became insolvent as a result of the sale of the Corona Del Mar residence.

115.    Lugano is harmed because Moti does not have sufficient assets in the United States to satisfy his obligations to Lugano in full.

116.    Pursuant to Section 550(a) of the Bankruptcy Code and applicable California law, Moti must return the value of the Serenade Newport property.

## COUNT XI

### FRAUD

117.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

20

118.    At all relevant times, Moti was the CEO of Lugano.

119.    Moti entered into several Outside Contracts with third parties in which he solicited funds from the third parties to either acquire an interest in diamonds that Moti claimed Lugano already owned or to purchase diamonds with additional funds from Lugano, with the agreement that the parties would then share the profits from Lugano's later sale of that diamond.

120.    Moti misrepresented the true nature of the Outside Contracts to Lugano by causing these transactions to be falsely recorded as sales in Lugano's books, causing the money received from the third parties to be falsely recorded as revenue in Lugano's books, and preventing the repayment obligations of the Outside Contracts from being properly recorded as obligations or liabilities in Lugano's books.

121.    Moti also presented forged sales documents and shipping records of empty shipments to Lugano to support the misrepresentation that these transactions were sales.

122.    Moti's varied efforts to conceal the Outside Contracts scheme confirm that he knew his conduct was wrongful.

123.    Moti intended Lugano to rely on these false misrepresentations designed to conceal the nature of the Outside Contracts.

124.    Lugano did, in fact, rely on these misrepresentations and was kept in the dark about the true nature of the Outside Contracts.

125.    Based on Moti's  misrepresentations, Lugano and the Estates are now subject to claims from the third parties with whom Moti entered into Outside Contracts, for which the Estates should not be liable.

126.    Moti separately caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

127.    Moti misrepresented the beneficiaries on the documentation accompanying the wire transfers to prevent Lugano from realizing that these were not legitimate business expenditures.

128.    Moti intended for Lugano to rely on the misrepresentations as to the true beneficiary of these wire transfers.

129.    Lugano did, in fact, rely on the misrepresentations as to the true beneficiary of these wire transfers.

130.    Moti's misrepresentation was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

131.    In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## COUNT XII

### CONCEALMENT

132.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

133.    At all relevant times, Moti was the CEO of Lugano and owed a duty to Lugano to be truthful with regard to business dealings he engaged in purportedly on behalf of Lugano.

134.    Moti entered several Outside Contracts with third parties in which he solicited funds from the third parties to either acquire an interest in diamonds that Moti claimed Lugano already owned or to purchase diamonds with additional funds from Lugano, with the agreement that the parties would then share the profits from Lugano's later sale of that diamond.

135.    Moti concealed the true nature of the Outside Contracts to Lugano by causing these transactions to be falsely recorded as sales in Lugano's books, causing the money received from the third parties to be falsely recorded as revenue in Lugano's books, and preventing the

repayment obligations on the Outside Contracts from being properly recorded as obligations or liabilities in Lugano's books.

136. Moti also presented forged sales documents and shipping records of empty shipments to Lugano to conceal the true nature of the Outside Contracts. To repay some of the third parties and avoid detection of his scheme, Moti directed payments from Lugano to legitimate vendors that were assisting Moti in his scheme, misrepresenting to Lugano that these were legitimate business payments to a vendor, and concealing the true purpose of these payments.

137. Moti's varied efforts to conceal the Outside Contracts scheme confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

138. Moti intended for Lugano to rely on these false misrepresentations designed to conceal the nature of the Outside Contracts.

139. Lugano did, in fact, rely on these misrepresentations and was kept in the dark about the true nature of the Outside Contracts.

140. Moti's concealment was a substantial factor in causing Lugano and the Estates to now face numerous claims and lawsuits from some of the third parties with whom Moti entered into the Outside Contracts with. Moti's concealment was also a substantial factor in causing substantial reputational harm to Lugano.

141. Separately, Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

142. Moti misrepresented the beneficiaries on the documentation accompanying the wire transfers to prevent Lugano from realizing that these were not legitimate business expenditures.

23

143. Moti intended for Lugano to rely on the misrepresentations as to the true beneficiary of these wire transfers.

144. Lugano did, in fact, rely on the misrepresentations as to the true beneficiary of these wire transfers.

145. Moti's concealment was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

146. In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## COUNT XIII

### BREACH OF FIDUCIARY DUTY

147. Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

148. At all relevant times, Moti was the CEO of Lugano and owed fiduciary duties to Lugano.

149. Moti entered several Outside Contracts with third parties in which he solicited funds from the third parties to either acquire an interest in diamonds that Moti claimed Lugano already owned or to purchase diamonds with additional funds from Lugano, with the agreement that the parties would then share the profits from Lugano's later sale of that diamond.

150. Moti concealed the true nature of the Outside Contracts to Lugano by causing these transactions to be falsely recorded as sales in Lugano's books, causing the money received from the third parties to be falsely recorded as revenue in Lugano's books, and preventing the repayment obligations of the Outside Contracts from being properly recorded as obligations or liabilities in Lugano's books.

151.    Moti also presented forged sales documents and shipping records of empty shipments to Lugano to conceal the true nature of the Outside Contracts.

152.    Moti's varied efforts to conceal the Outside Contracts scheme confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

153.    Moti's conduct with respect to the Outside Contracts breached his fiduciary duties to Lugano.

154.    This breach of fiduciary duty was a substantial factor in causing Lugano to now face numerous lawsuits and claims in the Chapter 11 Cases from some of the third parties with whom Moti entered into Outside Contracts.  It was also a substantial factor in causing substantial reputational harm to Lugano.

155.    Separately, Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

156.    Moti misrepresented the beneficiaries on the documentation accompanying the wire transfers to prevent Lugano from realizing that these were not legitimate business expenditures.

157.    Moti's conduct with respect to the wire transfers sent to an account belonging to the Haim Family Trust breached his fiduciary duties to Lugano.

158.    This breach of fiduciary duty was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

159.    In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## COUNT XIV

### CIVIL THEFT
### (Calif. Penal Code § 496(c))

160.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

161.    At all relevant times, Moti was the CEO of Lugano.

162.    Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

163.    Moti intentionally concealed the true beneficiary of these wire transfers by misrepresenting to Lugano that these were legitimate business expenses and intentionally putting false beneficiary information in the documentation accompanying the wire transfers.

164.    Moti's efforts to conceal the recipients and nature of these wire transfers confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

165.    Moti knew that he did not have any right to the money he obtained from Lugano through these fraudulent wire transfers.

166.    Moti's conduct reflects a specific intent to obtain money from Lugano under false pretenses.

167.    Through his conduct, Moti obtained property belonging to Lugano under false pretenses.

168.    Moti's conduct was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

169.    In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## COUNT XV

### CONVERSION

170. Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

171. At all relevant times, Moti was the CEO of Lugano.

172. Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

173. Moti intentionally concealed the true beneficiary of these wire transfers by misrepresenting to Lugano that these were legitimate business expenses and intentionally putting false beneficiary information in the documentation accompanying the wire transfers.

174. Moti's efforts to conceal the recipients and nature of these wire transfers confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

175. Lugano had ownership of and a right to possess the money in its bank accounts.

176. Moti was aware that Lugano had a right to possess the money in Lugano's bank accounts.

177. Through his fraudulent wire transfers, Moti interfered with Lugano's right to possess the money in its bank accounts and instead wrongfully took possession of that money.

178. Moti's conduct was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

179. In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## COUNT XVI

## MONEY HAD AND RECEIVED

180.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

181.    At all relevant times, Moti was the CEO of Lugano.

182.    Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

183.    Moti intentionally concealed the true beneficiary of these wire transfers by misrepresenting to Lugano that these were legitimate business expenses and intentionally putting false beneficiary information in the documentation accompanying the wire transfers.

184.    Moti's efforts to conceal the recipients and nature of these wire transfers confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

185.    Through this conduct, Moti obtained money that was intended to be used for the benefit of Lugano.

186.    Moti took the money for himself and did not use it for the benefit of Lugano.

187.    Moti has not returned the money to Lugano and has been unjustly enriched as a result.

188.    Moti's conduct was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

189.    In his conduct, described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## COUNT XVII

## TURNOVER OF PROPERTY OF THE ESTATE (11 U.S.C. § 542)

28

190.    Lugano realleges and incorporates by reference each and every allegation contained i paragraphs 1 – 50 abov.

191.    At all relevant times, Moti was the CEO of Lugano.

192.    Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

193.    Moti caused additional assets of the Debtors' estates to be transferred out of the Debtors' estates to his or his relatives' possession, or to the Haim Family Trust.

194.    Neither Moti nor any transferees of such assets has used those assets for the benefit of Lugano or the other Debtors.

195.    The Debtors' estates have been depleted by the wire transfers and other transfers caused by Moti.

## COUNT XVIII

### AVOIDANCE/DISALLOWANCE OF SETOFF AND RECOUPMENT DUE TO INEQUITABLE CONDUCT

196.    Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

197.    To the extent any Defendant contends that amounts allegedly owed to Moti may be reduced by setoff or recoupment against alleged obligations of Moti, such contentions fail because the statutory and equitable requirements for setoff or recoupment are not met, and any exercise or effectuation of setoff post-petition is stayed and/or avoidable.

198.    Section 553 does not create a right of setoff; it preserves setoff rights that exist under applicable nonbankruptcy law, subject to the Bankruptcy Code's limitations.

199.    Setoff requires, among other things: (a) a valid enforceable claim; (b) mutuality of obligations between the same parties in the same capacity; and (c) that both debts arose prepetition.

200.   No right of setoff exists for Moti here because one or more elements are absent and because recognition of setoff would unfairly elevate Moti over other creditors, frustrate the priority scheme, and reward inequitable conduct.

201.   Similarly, recoupment is a narrow, equitable doctrine that is unavailable here. Given the misconduct and insider status alleged, equity bars recoupment. Plaintiff alleges extensive fraudulent schemes and insider misconduct by Moti, including forged invoices, sham shipments, round-tripping, and misappropriation to the Haim Family Trust.

202.   In short, Moti's inequitable conduct bars his claims for setoff and recoupment.

## COUNT XIX

**DECLARATORY JUDGMENT THAT DEFENDANTS HAVE NO RIGHT TO INDEMNITY AGAINST THE DEBTORS OR THEIR ESTATES (28 U.S.C. § 2201; Fed. R. Bankr. P. 7001(9))**

203.   Lugano realleges and incorporates by reference each and every allegation contained in paragraphs 1 – 50 above.

204.   The Claim raises "Indemnity Claims Resulting from Actions Brought by Diamond Contractors Against Ferder." Defendants' assertion of indemnity in the Claim, and any related assertions of indemnity in or arising from Defendants' pleadings and defenses, create an actual, ripe controversy between Plaintiff and Defendants regarding whether any indemnity obligation exists that is cognizable against the Debtors or their estates. A judicial declaration will resolve uncertainty concerning estate liabilities and the allowance or disallowance of the indemnity component of Defendants' claim.

205.   Declaratory relief is appropriate under 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9) because a prompt determination of the parties' rights will clarify whether any indemnity exists, guide the administration of the estates, and avoid needless litigation expense and inconsistent results concerning the allowance of indemnity-based claims against the estates.

206.    Plaintiff alleges pervasive schemes and misconduct by Moti, including forged documents, fictitious sales, sham shipments, misclassification of transactions, roundtripping, concealment of liabilities, and diversion of estate assets, which exposed the Debtors to massive liability and resulted in prepetition and postpetition harm to the estates. As further alleged, Moti also caused transfers to or for the benefit of the Haim Family Trust and concealed beneficiaries of certain wire transfers. Any indemnity in favor of Defendants is barred and/or unenforceable, in whole or in part, by the doctrines of illegality, fraud, and unclean hands, including because public policy prohibits indemnification for losses caused by a party's own fraud or willful misconduct.

207.    Furthermore, Defendants are not lawfully entitled to indemnity for intentional torts, willful misconduct, or fraud. Plaintiff's operative allegations sound in fraud, concealment, breach of fiduciary duty, civil theft, and other intentional or willful misconduct by Moti and related transferees. Any indemnity covering such conduct would be void or unenforceable as a matter of applicable nonbankruptcy law and public policy.

208.    To the extent any indemnity is asserted, it is void, voidable, or otherwise unenforceable under applicable nonbankruptcy law for failure of consideration, unconscionability, illegality, contravention of public policy, lack of capacity or authority, breach of fiduciary duty in procurement, or other contract defenses.

209.    Given the alleged insider status and inequitable conduct by Moti and the asserted harm to the estates and creditors, equity further supports declaring that no indemnity is owed and disallowing any indemnity-based recovery on the Claim.

**PRAYER FOR RELIEF**

WHEREFORE, Lugano respectfully requests that judgment be entered in favor of Lugano as follows:

a.  Disallowing the Claim pursuant to 11 U.S.C. § 502 and Bankruptcy Rule 3001(f);

b.  To the extent not otherwise disallowed, equitably subordinating the Claim to the claims of Lugano's general unsecured creditors pursuant to 11 U.S.C. § 510(c);

c.  Disallowing the Claim pursuant to 11 U.S.C. § 502(d);

d.  Disallowing the Claim to the extent the value thereof exceeds the value of Moti's services;

e.  Allowing Lugano to recoup and/or setoff any amounts due to Lugano against any amount(s) of the Claim that may be allowed;

f.  A determination that Lugano's transfers to Moti of an amount not less than $155,253.49 constitute an avoidable transfer; an order avoiding said transfers; and judgment against Moti in the amount of the voidable transfers;

g.  A determination that Lugano's transfers to Moti of an amount not less than $1,083,477.28 constitute an avoidable transfer; an order avoiding said transfers; and judgment against Moti in the amount of the voidable transfers;

h.  A determination that Lugano's transfers to the Haim Family Trust of an amount not less than $2.1 M constitute an avoidable transfer; an order avoiding said transfers; and judgment against Moti, as trustee for the Haim Family Trust, in the amount of the voidable transfers;

i.  A determination that Lugano's transfers to the Haim Family Trust of an amount not less than $2.1 M constitute an avoidable transfer and judgment against Moti in the amount of the voidable transfers;

j.  A determination that Moti's transfer of the California residence constitutes an avoidable transfer;

k.  An order avoiding the transfer of the California residence or an amount equal in value;

l.  Judgment against Moti as to count XI in an amount determined at trial;

m.  Judgment against Moti as to count XII in an amount determined at trial;

n.  Judgment against Moti for breach of his fiduciary duties in an amount to be determined at trial;

o.  Judgment against Moti as to count XIV in an amount determined at trial;

p.  Judgment against Moti as to count XV in an amount determined at trial;

q.  Judgment against Moti as to count XVI in an amount determined at trial;

r.  Judgment against Moti as to count XVII in an amount determined at trial;

s.  A declaration that the Defendants have no right to indemnity, defense, reimbursement, advancement, or hold-harmless from Debtors or the estates for any claim, action, loss, liability, cost, or expense;

t.  Pre-judgment and post-judgment interest;

u.  All costs of court; and

v.  Any other relief the circumstances may require.

Dated: June 24, 2026

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Edmon L. Morton*
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Shella Borovinskaya (Del. No. 6758)
Brynna M. Gaffney (Del No. 7402)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email: emorton@ycst.com
      sbeach@ycst.com
      sborovinskaya@ycst.com
      bgaffney@ycst.com


-and-

**STEPTOE LLP**
Vincent P. (Trace) Schmeltz III (admitted *pro hac vice*)
Kenneth Kansa (admitted *pro hac vice*)
227 West Monroe Street, Suite 4700
Chicago, IL 60606
Telephone:  (312) 577-1227
Email:  tschmeltz@steptoe.com
      kkansa@steptoe.com

*Attorney for the Special Committee of the Board of Directors of Lugano Diamonds & Jewelry Inc.*