**Exhibit B**

**Claim**

UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE

Lugano Diamonds & Jewelry Inc. - Case No. 25-12055

**FILED**

Claim No. 160

**January 27, 2026**

By Omni Claims Agent
For U.S. Bankruptcy Court
District of Delaware

Official Form 410

# Proof of Claim

04/25

Read the instructions before filling out this form.  This form is for making a claim for payment in a bankruptcy case.  Do not use this form to make a request for payment of an administrative expense.  Make such a request according to 11 U.S.C.  § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents.  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements.  **Do not send original documents;** they may be destroyed after scanning.  If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.  That date is on the notice of bankruptcy (Form 309) that you received.**

Carefully read instructions included with this Proof of Claim before completing.  In order to have your claim considered for payment and/or voting purposes, complete ALL applicable questions.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Mordechai Ferder, individually and in his capacity as Trustee of The Haim Family Trust
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No
[ ] Yes    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Jeffrey H. Reeves c/o Reeves & Weiss LLP
Name

3333 Michelson Drive Suite 300
Number        Street

Irvine, CA 92612
City                State          ZIP Code

Contact Phone  949-231-9975

Contact email  JReeves@reevesandweiss.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one)

**Where should payments to the creditor be sent? (if different)**

Jeffrey H. Reeves c/o Reeves & Weiss LLP
Name

3333 Michelson Drive Suite 300
Number        Street

Irvine, CA 92612
City                State          ZIP Code

Contact Phone  949-231-9975

Contact email  JReeves@reevesandweiss.com

**4. Does this claim amend one already filed?**

[X] No
[ ] Yes    Claim Number on court claims registry (if known) _____    Filed On _____
                                                                                      MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No
[ ] Yes    Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**

[X] No

[ ] Yes    Last 4 digits of the debtor's account or any number you use to identify the debtor:

---

**7.** **How much is the claim?**    $ 36,024,500.00

**Does this amount include interest or other charges?**

[ ] No

[X] Yes    Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

See attached

---

**9.** **Is all or part of the claim secured?**

[X] No

[ ] Yes    The claim is secured by a lien on property

**Nature of property:**

[ ] Real Estate    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*

[ ] Motor Vehicle

[ ] Other    Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

**Value of Property:**    $ _____

**Amount of the claim that is secured:**    $ _____

**Amount of the claim that is unsecured:**    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7).

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate:**    (when case was filed)    _____ %

[ ] Fixed
[ ] Variable

---

**10.** **Is this claim based on a lease?**

[X] No

[ ] Yes    **Amount necessary to cure any default as of the date of the petition.**    $ _____

---

**11.** **Is this claim subject to a right of setoff?**

[X] No

[ ] Yes    Identify the property: _____

---

**12.** **Is this claim for the value of goods received by the debtor within 20 days before the commencement date of this case (11 U.S.C. §503(b)(9))?**

[X] No

[ ] Yes    Amount of 503(b)(9) Claim:    $ _____

---

**13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes    *Check all that apply*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$ _____

☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$ _____

☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$ _____

☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5).

$ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

$ _____

\* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

---

| Part 3: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it.**

**FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am the guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    1/27/2026
MM / DD / YYYY

Mordechai Ferder
Signature

**Print the name of the person who is completing and signing this claim:**

Name    Mordechai Ferder
Full Name

Title    _____

Company    c/o Reeves & Weiss LLP
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    3333 Michelson Drive Suite 300
Number        Street

Irvine, CA 92612
City                State        ZIP Code

Contact Phone    949.231.9975        Email    JReeves@reevesandweiss.com

**Fill in this information to identify the case:**

Debtor 1      Lugano Diamonds & Jewelry Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  District of Delaware

Case number   25-12055 (BLS)

---

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

Mordechai Ferder, individually and in his capacity as Trustee of The Haim Family Trust

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Jeffrey H. Reeves C/O Reeves & Weiss LLP
Name

3333 Michelson Drive Ste. 300
Number      Street

Irvine              CA          92612
City              State         ZIP Code

Contact phone 949-231-9975

Contact email  JReeves@reevesandweiss.com

**Where should payments to the creditor be sent?** (if different)

_____
Name

_____
Number      Street

_____
City              State         ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

---

Official Form 410                    **Proof of Claim**                    page 1

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____36,024,500_____. **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Attached
_____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                                $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\*  Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑  I am the creditor.

☐  I am the creditor's attorney or authorized agent.

☐  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   _01/27/2026_____
                    MM / DD / YYYY

_____
    Signature

**Print the name of the person who is completing and signing this claim:**

| | |
|---|---|
| Name | Mordechai Ferder |
| | First name        Middle name        Last name |
| Title | |
| Company | c/o Reeves & Weiss LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3333 Michelson Drive Ste. 300 |
| | Number        Street |
| | Irvine                          CA          92612 |
| | City                            State       ZIP Code |
| Contact phone | 949-231-9975        Email  JReeves@reevesandweiss.com |

Mordechai Haim Ferder, individually and in his capacity as Trustee of The Haim Family Trust  ("**Mr. Ferder**" or "**Claimant**") founded Debtor Lugano Diamonds & Jewelry, Inc. ("**Lugano**") in Newport Beach, California in 2005.  In 2021, Compass Diversified Holdings, Inc., ("**Compass**"), a publicly traded company recognized Lugano's potential and bought 60% of Mr. Ferder's beneficially held 100% stake in the company.  Mr. Ferder stayed on as CEO pursuant to an Employment Agreement entered into by and between Lugano and Mr. Ferder dated September 3, 2021 ("**Employment Agreement**").

**The components of Claimant's claim are as follows:**

1. **Funds Paid by Claimant on Contracts that Lugano Was Obligated to Pay**

Lugano is the party to and the primary obligor on a number of contracts ("**Diamond Contracts**") entered into with third-party clients ("**Diamond Contractors**") wherein the Diamond Contractors provided funds to Lugano.  Despite the funds generated by these contracts going directly into Lugano's accounts, and being used entirely for Lugano business purposes, Lugano failed to honor those contracts. In connection with the Diamond Contracts, Lugano received another $6.4 million from Claimant.

2. **Funds Paid by Claimant to Cover Lugano Business Expenses**

In addition to the funds paid by Claimant for the obligations of Lugano on the Diamond Contracts, Claimant advanced approximately $8,500,000 in additional funds to pay Lugano business expenses, including for unpaid salary and accrued bonuses owed by Lugano.  Claimant paid a number of the Diamond Contractors and other obligations of Lugano from his own personal funds totaling $29,624,500 as set forth in Addendum A - $27,672,500.00 and Addendum B - $1,952,000.00.

3. **Labor Code Violations and Wrongful Termination**

Claimant has California Employment law claims against Lugano, in an amount to be determined, at which time this Claim will be amended based on the following:

A. **Indemnification for Necessary Expenditures (Cal. Lab. Code § 2802):** At all relevant times, Mr. Ferder was an employee of Lugano. During his employment, Mr. Ferder personally incurred necessary expenditures and losses in direct consequence of the discharge of his duties, including injecting upwards of millions of his personal funds to cover Lugano's day-to-day operations, payroll, and other debts. Lugano has failed and refused to indemnify Mr. Ferder for these expenditures as required by law.

B. **Failure to Pay Wages Upon Termination (Cal. Lab. Code §§ 201-203):** Upon Mr. Ferder's separation from employment in May 2025, Lugano willfully failed to pay him all wages due, including but not limited to unpaid salary, accrued bonuses, and the reimbursement of business expenses owed pursuant to Labor Code § 2802. Mr.

Ferder is therefore entitled to waiting time penalties equal to his daily rate of pay for up to 30 days.

C.  **Wrongful Termination in Violation of Public Policy:** Mr. Ferder was forced to resign under duress and was effectively terminated by Lugano and Compass. This termination was motivated by a desire to make him a scapegoat for business practices that Lugano was aware of, had endorsed, and from which they had profited, and to conceal their own breaches of fiduciary duty and securities law violations from shareholders and the public. Terminating an employee for such a purpose violates fundamental public policies of the State of California.

4.  **Indemnity Claims Resulting from Actions Brought By Diamond Contractors Against Mr. Ferder**

There are a total of eight (8) state court actions currently pending before the Orange County Superior Court of the State of California ("**State Court**") in which Mr. Ferder (as well as Lugano as to seven of the actions) are named defendants.  Each of the seven actions involve materially the same core set of facts and arise out of the Diamond Contracts.  In the seventh action, Simba IL Holdings, LLC ("**Simba Holdings**") is named instead of Lugano as a defendant.  Simba Holdings is the 40% equity interest holder of Lugano Holding, Inc. (one of the debtors in the jointly administered Lugano bankruptcy cases).

The State Court cases are:

*Bryan Gadol v. Mordechai Ferder*, Case No. 30-2025-01488102-CU-BC-CJC (stay filed by Lugano); *Raymond W. Cohen v. Lugano Diamonds & Jewelry Inc.*, Case No. 30-2025-01490111-CU-BC-CJC; *Ken Kraus v. Lugano Diamonds & Jewelry, Inc.*, Case No. 30-2025-014901065-CU-BC-CJC (stay filed by Lugano); *Barry Aronoff v. Mordechai Ferder*, Case No. 30-2025-01490509-CU-FR-CJC (stay filed by Lugano); *Lugano Diamonds & Jewelry Inc. v. Mordechai Ferder*, Case No. 30-2025-01492210-CU-CO-CJC; *Avina LLC v. Lugano Diamonds & Jewelry, Inc.*, Case No. 30-2-25-1495834-CU-FR-CJC; *The Arvielo Family Trust v. Lugano Diamonds & Jewelry Inc.*, Case No. 30-2025-01506931-CU-BC-CJC (stay filed by Lugano), and *Champion Force Industrial Limited v. Lugano Diamonds & Jewelry Inc.*, Case No. 30-2025-01499613-CU-BC-CJC (Stay filed by Lugano).

Claimant has claims against Lugano for equitable indemnity for all monetary expenses, including, but not limited to litigation expenses, that he has been forced to incur as a result of Lugano's failure to honor its obligation to satisfy the Diamond Contracts, in an amount to be determined, at which time this Claim will be amended.

**5.   Set off and Recoupment Claims**

Claimant has set off and recoupment claims for all of the foregoing in an amount to be determined, at which time this Claim will be amended.

**6.   Claim of Interest**

Claimant asserts a claim of interest in Lugano.

**Addendum A**

Transfers from Mordecai Ferder's Charles Schwab account to pay obligations of Lugano Diamonds & Jewelry, Inc.

| Date | Amount |
|---|---|
| 9/8/21 | $875,000 |
| 9/24/21 | $850,000 |
| 9/20/21 | $1,200,000 |
| 9/23/21 | $1,300,000 |
| 9/28/21 | $2,525,000 |
| 10/12/21 | $1,500,000 |
| 10/14/21 | $850,000 |
| 10/20/21 | $1,125,000 |
| 11/2/21 | $510,000 |
| 11/23/21 | $3,500,000 |
| 12/1/21 | $625,000 |
| 1/28/22 | $750,000 |
| 2/8/22 | $1,946,000 |
| 9/12/22 | $2,150,000 |
| 11/2/23 | $364,000 |
| 1/16/24 | $1,480,000 |
| 1/17/24 | $300,000 |
| 10/11/24 | $357,500 |
| 1/29/25 | $250,000 |
| 2/7/25 | $2,500,000 |
| 2/10/25 | $650,000 |

CORE/3536099.0002/237243040.1

| | | |
|---|---|---|
| 2/11/25 | | $2,065,000 |
| | **Total** | **$27,672,500.00** |

CORE/3536099.0002/237243040.1

**Addendum B**

Transfers from Mordecai Ferder's Bank of America Account to pay obligations of Lugano Diamonds & Jewelry, Inc.

| Claim Date | Claim Amount |
|---|---|
| April 1, 2024 | $92,000 |
| December 17, 2024 | $1,110,000 |
| January 29, 2025 | $50,000 |
| March 4, 2025 | $500,000 |
| March 31, 2025 | $200,000 |
| **Total** | **$1,952,000.00** |

CORE/3536099.0002/237243378.1

**Addendum C**

CORE/3536099.0002/237248850.1

**EXECUTION VERSION**

**LUGANO DIAMONDS & JEWELRY INC.,**
**EMPLOYMENT AGREEMENT**
**MORDECHAI HAIM FERDER**

THIS EMPLOYMENT AGREEMENT (this "**Agreement**") is made as of September 3, 2021, between Lugano Diamonds & Jewelry, Inc., a California corporation (the "**Company**"), and Mordechai Haim Ferder ("**Executive**").

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1.     EMPLOYMENT**.  The Company shall employ Executive, and Executive hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and ending as provided in paragraphs 4 and 5 hereof (the Initial Period and the Extended Period (both as defined in paragraph 4), if there is any Extended Period, together the "**Employment Period**").

**2.     POSITION AND DUTIES**.

(a)     During the Employment Period, Executive shall serve as the Chief Executive Officer of the Company and shall have the normal duties, responsibilities, functions and authority customarily associated with such position and such other duties and responsibilities as may be assigned from time to time to Executive by the Company's Board of Directors (the "**Board**") that are consistent with Executive's position, all subject to the power and authority of the Board or the Executive Committee of the Board (the "**Executive Committee**") to expand or limit such duties, responsibilities, functions and authority and to overrule actions of officers of the Company, *provided* that any limitation approved by the Board or the Executive Committee may give rise to Good Reason in the event such limitation constitutes a material diminution in the duties, responsibilities or authority of the Executive unless Executive provides written consent to such limitation.

(b)     Executive shall report to the Board, and Executive shall devote substantially all of Executive's business time to the business and affairs of the Company and its Subsidiaries.  Executive shall perform Executive's duties, responsibilities and functions to the Company and its Subsidiaries hereunder in a diligent, trustworthy and professional manner and shall comply with the written policies and written procedures of the Company and its Subsidiaries applicable to Executive.  So long as Executive is employed by the Company, Executive shall not, except as provided herein or with the prior written consent of the Board, render to any other person, corporation, firm, company, joint venture or other entity any services of any kind for compensation, or engage in any other activity that would materially interfere with the performance of Executive's duties for the Company and its Subsidiaries.  Notwithstanding the foregoing, Executive may engage in charitable, civic, fraternal, educational and trade association activities, and may manage his and his family's investments in a manner that is not competitive with the Company, in each case, to the extent that the same do not interfere materially with Executive's obligations to the Company.  A schedule of activities of the nature

referenced in this paragraph 2(b) in which Executive is currently engaged is set forth on Schedule A attached hereto and Executive's continued participation in such entities shall not be considered a violation of this paragraph 2(b).  Further, nothing in this Agreement shall limit Executive's ability to:  (i) serve as a member of any board of directors for any non-profit organization, so long as such membership does not interfere materially or conflict with Executive's obligations to the Company or (ii) engage in activities as otherwise agreed by the Board in writing.

(c)     For purposes of this Agreement, "**Subsidiary**" shall mean any corporation or other entity of which the securities or other ownership interests having the voting power to elect a majority of the board of directors or other governing body are, now or hereafter, owned directly or indirectly by the Company.

3.     **COMPENSATION AND BENEFITS**.

(a)     Base Salary and Target Bonus.  During the Employment Period, Executive's base salary shall be $600,000 per annum, to be paid in accordance with the Company's customary payroll practices.  Executive's applicable base salary as adjusted pursuant to this paragraph is referred to herein as the "**Base Salary**." Executive's Base Salary will be reviewed on an annual basis by the Compensation Committee of the Board (the "**Compensation Committee**") and may be increased (but not decreased), from time to time thereafter, at the discretion of the Compensation Committee.

(b)     Performance Bonus.

(i)     For the year ending December 31, 2021, Executive will receive a cash bonus calculated as follows: (i) an amount equal to Executive's cash bonus opportunity for fiscal year 2022 per Section 3(b)(ii) below ($225,000 *multiplied by* (ii) a fraction with (x) a numerator equal to the number of days Executive is employed by the Company between the date of this Agreement and December 31, 2021 and (y) a denominator equal to 365.  Executive's bonus for the year ending December 31, 2021 shall be paid in accordance with the Company's bonus payment arrangement with Executive prior to the date of this Agreement.

(ii)     Beginning with the fiscal year ending December 31, 2022, Executive will be eligible to participate in the Incentive Bonus Plan attached hereto as Exhibit A (the "**Bonus Plan**").  Pursuant to the terms of the Bonus Plan, Executive will be eligible to receive a cash bonus of $225,000 at target (the "**Target Bonus**") or such other amount as may be determined by the Company in accordance with the Bonus Plan (the "**Performance Bonus**").  Except as otherwise specifically provided in Section 5(b)(ii) below, in order to receive a Performance Bonus with respect to a Plan Year (as defined under the Bonus Plan) Executive must be employed at such time as Performance Bonuses are paid to other officers with respect to such year; provided, however, in the Compensation Committee's sole discretion, the Company shall be entitled to pay Executive a Performance Bonus for a year that has already ended if Executive's employment with the Company ceases after the end of such year, but before such payment date.  In no event shall the payment date for a Performance Bonus occur later

2

than 2.5 months following the end of the Plan Year during which such Performance Bonus was earned.  Nothing contained herein shall restrict the Company's right in its sole discretion to adopt, modify or otherwise alter, in whole or in part, any and/or all of the Bonus Plan in accordance with its terms.

(c)    Employee Benefits.  Executive shall be included, to the extent eligible under the terms and conditions, as such terms and conditions may be established or changed from time to time by the Board in its sole discretion, in any and all of the Company plans providing benefits for its executives or employees.  Nothing contained herein shall obligate the Company to adopt or maintain any benefit plan and nothing herein shall restrict the Company's right in its sole discretion to adopt, modify or otherwise alter, in whole or in part, any and/or all of its benefit plans.  In addition, (i) in the event that Executive travels for business purposes, Executive may elect to fly on a private plane to the extent consistent with past practice, or if Executive elects not to fly on a private plane, may elect to travel first class, and in either case, the Company shall pay all of Executive's expenses relating to the foregoing (but the aggregate amount paid in respect of flights on private planes shall not exceed $300,000 during any calendar year) and (ii) the Company shall pay (grossed-up for taxes, if any, at the time of payment) Executive's lease payments relating to Executive's current automobile until such current lease expires in a manner consistent with the Company's practice through the date of this Agreement.

(d)    Time Off.  Executive shall participate in the Company's unlimited time off policy for officers, as may be in effect from time to time.

(e)    Business Expenses.  During the Employment Period, the Company shall reimburse Executive for all reasonable business expenses incurred by Executive in the course of performing Executive's duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(f)    Payroll Withholdings.  From each payment to Executive under this Agreement, the Company may report, withhold and pay to the proper governmental authorities any and all amounts required by law to be withheld for federal, state and local income and employment taxes, and any and all other amounts required by law to be reported and/or withheld from Executive's income.  The Company may also deduct from Executive's income those sums authorized by Executive in writing and approved by the Company.

4.    TERM.  Subject to paragraph 5 hereof, the Employment Period shall be for a period commencing on the date of this Agreement and ending on December 31, 2023 (the "**Initial Period**") and shall thereafter automatically renew for successive periods of one year each (collectively, the successive periods, the "**Extended Period**"), unless either party provides at least 60 days' written notice to the other party prior to the expiration of the Initial Period or any Extended Period, as applicable, that this Agreement shall not be renewed.

3

**5.** **TERMINATION OF EMPLOYMENT**.

(a)      <u>Termination</u>.  This Agreement, the Employment Period and the employment of Executive by the Company may be terminated at any time as follows:

(i)      By mutual agreement of the parties;

(ii)      By the Company if Executive dies or becomes Disabled.  For purposes of this Agreement, "**Disabled**" shall mean Executive is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

(iii)      By the Company for Cause.  For purposes of this Agreement, "**Cause**" shall mean with respect to Executive, one or more of the following:  (A) willful violation of the Executive's fiduciary duties to the Company, including the duty of loyalty and the corporate opportunity doctrine, (B) conviction for, or the entry of a plea of nolo contendere (or similar plea) to a charge of, (1) any crime involving fraud, misappropriation or embezzlement, or (2) any felony, (C) any violation of law that causes material injury to the business of the Company or any of its Subsidiaries, (D) failure or refusal to comply with the Board's reasonable and lawful orders or directives that are consistent with Executive's position or the Company's reasonable written rules, written regulations, written policies or written procedures that are applicable to Executive and that are not inconsistent with applicable law, in each case, which results in material harm to the Company, (E) gross negligence or willful misconduct in connection with the performance of the Executive's duties to the Company and (F) any breach by the Executive of any provision of this Agreement that causes material injury to the business of the Company, or any breach by Executive of any non-competition covenant between Executive and the Company, and in the case of each of (A), (D), (E) or (F), which, if curable, continues uncured for 30 days following written notice thereof from the Company to Executive;

(iv)      By the Company without Cause;

(v)      By Executive for Good Reason.  For purposes of this Agreement, "**Good Reason**" means Executive's resignation from employment at any time within 30 days following the expiration of the Company cure period (discussed below) following the occurrence of one or more of the following without the Executive's written consent: (A) a reduction in the Executive's base salary (excluding bonuses and all other compensation) (other than a substantially similar reduction applicable to all executives of the Company and not exceeding 15% of Executive's Base Salary), (B) a material diminution in the duties, responsibilities or authority of the Executive, (C) the Company's material breach of this Agreement other than any such breach arising from the actions or omissions of Executive, or (D) the Company moves the Executive's primary location of employment outside of Orange County, California, provided that (x) "primary location of employment" shall refer to the offices of the Company and not be deemed to refer to the location where Executive is providing services during any stay-at-home, safer-at-home or

4

similar governmental orders, directives, or recommendations issued in response to COVID-19 (or any other pandemic) and (y) reasonable business travel in connection with the performance of Executive's duties pursuant to this Agreement shall not constitute Good Reason.  Under this Agreement, the Executive will not be able to resign for Good Reason without first providing the Company with written notice of the acts or omissions constituting the grounds for "**Good Reason**" within 30 days of the initial existence of the grounds for "**Good Reason**" and a reasonable cure period of 30 days following the date of such notice;

(vi)     By Executive without Good Reason; provided that Executive agrees to give the Company not less than 90 days' written notice of Executive's resignation without Good Reason.

(b)     Consequences of Termination.  Executive shall be entitled to the following compensation in the event of termination of Executive's employment pursuant to the terms of paragraph 5(a):

(i)     Following any termination under paragraphs 5(a)(i), (ii), (iii) or (vi), Executive (or, in the event of Executive's death, Executive's estate) shall be entitled to receive a lump sum payment in an amount equal to the accrued and unpaid portion of Executive's Base Salary earned through the date of termination or death *plus* any business expenses incurred (in accordance with Company policy) and un-reimbursed as of the date of termination or death, *plus*, in the event of a termination under paragraph 5(a)(ii), Performance Bonus for the immediately preceding year if the date of termination or death is after the end of such year, to the extent unpaid as of the date of termination or death (which Performance Bonus amount shall be payable at such time as such bonus would have otherwise been paid), *plus* all vested benefits in accordance with the employee benefit plans in which Executive was participating prior to such termination or death.

(ii)     Following any termination under paragraphs 5(a)(iv) or 5(a)(v), Executive shall be entitled to receive (A) a lump sum payment in an amount equal to Executive's accrued and unpaid Base Salary through the date of termination plus any authorized business expenses incurred (in accordance with Company policy) and un-reimbursed as of the date of termination, (B) Performance Bonus for the immediately preceding year if the date of termination is after the end of such year, to the extent unpaid as of the date of termination (which Performance Bonus amount shall be payable at such time as such bonus would have otherwise been paid), (C) all vested benefits in accordance with the employee benefit plans in which Executive was participating prior to such termination and (D) subject to Executive's compliance with Sections 6 and 7, severance in an amount equal to 18 months of Executive's Base Salary at the rate in effect as of the date of termination (unless Executive's Base Salary was reduced in violation of Section 5(a)(v)(A), in which case it shall be an amount based on the per annum rate of Base Salary as in effect immediately prior to such reduction) (the "**Salary Severance**"), which Salary Severance shall be payable over the Severance Period (as defined below) in substantially equal monthly payments, plus payment by the Company of Executive's and Executive's eligible dependents' COBRA premiums for the Severance

5

Period (the "**COBRA Severance**").   The "**Severance Period**" shall be 18 months. Executive agrees that, as a condition to and in consideration of receiving any Salary Severance and COBRA Severance pursuant to this section, Executive will be required to execute and deliver to the Company a release of only employment-related claims in a form mutually acceptable to Executive and the Company (such release to be provided to Executive within 5 days after the date of termination).  Such release shall be executed and delivered (and no longer subject to revocation, if applicable) within the sixty (60) day period following Executive's termination of employment (the revocation period shall be 7 days).  Any Salary Severance or COBRA Severance payments that would otherwise be provided before the date such release becomes irrevocable shall be accumulated and paid in a lump sum on the date such release becomes irrevocable; provided that to the extent that the payment of any amount constitutes "nonqualified deferred compensation" for purposes of Code Section 409A, then if such 60 day period crosses two calendar years, then to the extent required by Code Section 409A, the first payment of the Salary Severance and COBRA Severance shall be paid on the later of the first day of such second calendar year and the first regularly scheduled pay date following the effective date of such release (and in all events, within 74 days after the date of termination), and shall include payment of any amount that was otherwise scheduled to be paid prior thereto, with all remaining payments to be made as if no such delay had occurred.  For the avoidance of doubt, the Company's decision to not renew this Agreement shall not entitle Executive to receive the Salary Severance or COBRA Severance.

(iii)    Any payment under paragraphs 5(b)(i) and (ii) shall be made in accordance with the Company's normal payroll practices (except as otherwise provided in such paragraphs), and, other than the payment of such amounts, the Company's obligation to make any further severance payments of any kind or provide any severance benefits of any kind to Executive shall cease and terminate upon Executive's date of termination.

(c)    <u>Suspension of 409A Payments</u>.  To the extent any amount payable under this Agreement on account of Executive's termination of employment constitutes deferred compensation subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "**Code**"), such payments shall be made when the Executive incurs a Separation from Service (as such term is defined herein below).  However, any payment or benefit under this Agreement that is subject to Code Section 409A(a)(2)(B)(i) of the Code and was scheduled to be paid or provided on or before the date that is six months following Executive's Separation from Service (as defined below) shall be delayed to the extent required by Code Section 409A until a date that is six months and one day from the date of Executive's Separation from Service (or the date of Executive's death if earlier) (the "**409A Suspension Period**").  Within 10 days after the end of the 409A Suspension Period, the Company shall pay to Executive in one lump sum the aggregate of such delayed payments (but such payments and benefits shall not be paid or provided earlier than otherwise scheduled).  After the 409A Suspension Period, Executive shall receive any remaining cash payments or benefits in accordance with the terms of this Agreement (as if there had not been any 409A Suspension Period beforehand).  For purposes of this Agreement, "**Separation from Service**" shall have the meaning set forth in Treasury Regulation Section 1.409A-1(h)(1)(i); provided, however, that pursuant to Treasury Regulation Section 1.409A-1(h)(1)(ii), the parties hereby provide that a "separation from service" shall occur within the

6

meaning of Treasury Regulation Section 1.409A-1(h)(1)(i) and (ii) as of the first date coincident with or following a termination of employment that the Company and Executive reasonably anticipate that the level of bona fide services that Executive will perform for Company (and any entity that would be considered the same "service recipient" as Company under Code Section 409A) (collectively, the "**Service Recipient**") in the future (whether as an employee or an independent contractor) will permanently decrease to a level equal to twenty percent or less of the average level of bona fide services Executive provided to the Service Recipient in the 36 months immediately preceding such date (or the full period of service to the Service Recipient if Executive has been providing services to the Service Recipient for less than 36 months).

6.      **CONFIDENTIAL INFORMATION**.

(a)      Executive acknowledges that the continued success of the Company and its Subsidiaries and affiliates depends upon the use and protection of a large body of confidential and proprietary information.  All of such confidential and proprietary information now existing or to be developed in the future will be referred to in this Agreement as "**Confidential Information**." Confidential Information will be interpreted as broadly as possible to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (i) related to the Company's or its Subsidiaries' or affiliates' current or potential business or is disclosed to the Company or its Subsidiaries by any third party pursuant to a confidentiality agreement, and (ii) is not generally or publicly known.  Confidential Information includes, without specific limitation, information, observations and data created or obtained by Executive, or to which Executive otherwise has access, during the course of Executive's performance of the services under this Agreement, information concerning acquisition opportunities in or reasonably related to the Company's or its Subsidiaries' or affiliates' business or industry of which Executive becomes aware during the Employment Period, the persons or entities that are current, former or prospective suppliers or customers of any one or more of them during Executive's course of performance of services under this Agreement, as well as development, transition and transformation plans, methodologies and methods of doing business, strategic marketing, product development and business expansion plans, including plans regarding planned and potential sales and financial projections, employee lists and telephone numbers, locations of sales representatives, product designs and specifications, including any future or proposed products, manufacturing techniques and information, integration processes and financial information and forecasts.  Therefore, Executive agrees that Executive shall not at any time, directly or indirectly, use or disclose any Confidential Information except in the ordinary course of performance of Executive's duties.  Executive agrees to deliver to the Company promptly after the end of the Employment Period (but in no event later than 14 business days following the end of the Employment Period) all memoranda, notes, plans, records, reports and other documents relating to the business of the Company or its Subsidiaries or affiliates (including, without limitation, all Confidential Information), whether on paper or in any other tangible form or medium, and all copies thereof, in each case, that Executive may then possess or have under Executive's control.  To the extent such delivery is not feasible, Executive agrees that (x) Executive will irretrievably erase all such materials from all computer memories and other media storage devices within Executive's possession or control that are not so delivered to the Company, (y) Executive will not retain any copies, summaries or compilations ("versions") of any such Confidential Information of any kind or in any form, and (z) Executive will provide written certification that Executive has irretrievably erased all such materials and

has not retained any versions of such Confidential Information upon the Company's request. Notwithstanding the foregoing, Executive may retain copies of the contact information of his personal contacts.

(b)    During the Employment Period, Executive shall not use or disclose any confidential information or trade secrets, if any, of any former employers or any other person to whom Executive has an obligation of confidentiality, and shall not bring onto the premises of the Company or its Subsidiaries or affiliates or copy any such information to Company technology such as computers or other media storage devices any unpublished documents or any property belonging to any former employer or any other person to whom Executive has an obligation of confidentiality unless consented to in writing by the former employer or person.  Executive shall use in the performance of Executive's duties only information that is (i) generally known and used by persons with training and experience comparable to Executive's and that is (x) common knowledge in the industry or (y) otherwise legally in the public domain, (ii) otherwise provided or developed by the Company or its Subsidiaries or affiliates or (iii) in the case of materials, property or information belonging to any former employer or other person to whom Executive has an obligation of confidentiality, approved for such use in writing by such former employer or person.  If at any time during this employment with the Company or any Subsidiary, Executive believes Executive is being asked to engage in work that will, or will be likely to, jeopardize any confidentiality or other obligations Executive may have to former employers, Executive shall immediately advise the Board so that Executive's duties can be modified appropriately.

(c)    The obligations of Executive provided in this paragraph 6 shall last, as to any Confidential Information, for so long as that Confidential Information has proprietary value, whether during the Employment Period or after the termination of the Employment Period.

(d)    Notwithstanding the foregoing or anything contained in this Agreement to the contrary, Executive may disclose Confidential Information and other proprietary information (x) to the extent required by law, subpoena or court or government order, *provided*, *however*, that Executive shall give prompt written notice to the Company of such requirement (to the extent legally permissible), disclose no more information than is so required, and cooperate (at the Company's expense) with any attempts by the Company to obtain a protective order or similar treatment and (y) to the limited extent necessary to defend Executive against any suit or action by the Company or any of its Subsidiaries or affiliates.

**7.      INTELLECTUAL PROPERTY, INVENTIONS AND PATENTS**.

(a)    Executive acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable works, mask works and moral rights (in each case, whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable or trademarkable) which (i)(A) are developed using the equipment, supplies, facilities or Confidential Information of the Company or its Subsidiaries, or (B) relate to the Company's or its Subsidiaries' actual or demonstrably anticipated business, research and development or existing or future products or services, or (C) result from work performed by Executive for the Company or its Subsidiaries in connection with the designing, making, manufacturing, selling,

8

distributing, sourcing and/or marketing of tactical or tactical-inspired apparel, outerwear, nylon, footwear, gear (including backpacks, bags, packs) and/or accessories (the "**Tactical Business**"), and (ii) are conceived in connection with the Tactical Business, developed or made by Executive (whether solely or jointly with others) while employed by the Company and/or its Subsidiaries or after the termination of the Employment Period using the Company's Confidential Information, whether before or after the date of this Agreement ("**Work Product**"), belong to the Company or such Subsidiary.  Work Product does not include any discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable works, mask works and moral rights developed by Executive without the use of Confidential Information after the termination of the Employment Period.  Executive shall promptly disclose such Work Product to the Board and, at the Company's expense, perform all actions reasonably requested by the Board (whether during or after the Employment Period) to establish, confirm and perfect such ownership in the Company or its Subsidiaries, as applicable (including, without limitation, assignments, consents, powers of attorney, waivers of rights, including moral rights, and other instruments).  Executive acknowledges that all original works of authorship protected by copyright included in the Work Product are "works made for hire" as defined in the United States Copyright Act, 17 U.S.C. §101 and similar state law that is applicable to this Agreement.

(b)     As further consideration for the Company's entering into this Agreement, Executive hereby assigns to the Company all right, title and interest Executive owns or at any time may have to the Work Product (whether during the Employment Period or after the termination of the Employment Period).  At any time, whether during the Employment Period or after the termination of the Employment Period, upon reasonable request (and at the expense) of the Company, Executive shall fully cooperate with and assist the Company to protect the Company's right to and interest in the Work Product in any and all countries of the world, and, upon reasonable request of the Company, shall execute all documents and instruments and do all things that may be reasonably required in connection therewith.

Notwithstanding the foregoing, this Paragraph 7 does not apply to Work Product that qualifies fully as a non-assignable invention under the provisions of Section 2870 of the California Labor Code.  By signing this Agreement, Executive acknowledges that Executive has received and reviewed the notification attached to this Agreement as Exhibit B, and has disclosed to the Company all inventions that Executive believes are his property under Labor Code section 2870.

8.     **SEVERABILITY; REMEDIES**.

(a)     Whenever possible, each provision and term of this Agreement will be interpreted in a manner to be effective and valid, but, if any provision or term of this Agreement is held to be prohibited or invalid, then such provision or term will be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provision or term or the remaining provisions or terms of this Agreement.

(b)     Executive acknowledges the confidential and secret nature of Confidential Information and that the Company has devoted, and will continue to devote, considerable resources to the development or acquisition of the Confidential Information and Work Product.

9

In light of this expenditure of resources, Executive further acknowledges (i) that the Confidential Information and Work Product has great economic value and is proprietary to the Company, (ii) that access to and use of the Confidential Information is necessary and essential to the performance of Executive's duties and that development of Work Product is an inherent part of Executive's duties, (iii) that Executive's violation of Sections 6 or 7 would cause the Company to suffer immediate and irreparable harm and damage, (iv) that money damages would not provide an adequate remedy to the Company for any breach of Sections 6 or 7, and (v) that the restrictions and continuing obligations set forth in Sections 6 or 7 are fair and reasonably required for the protection of the Company and do not impose a greater restraint on Executive than is necessary to protect the rights and other business interests of the Company.  Therefore, in addition and supplementary to other rights and remedies existing in its favor, the Company shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it, at law or in equity, for any breach or threatened breach of this Agreement (including any of the provisions of paragraphs 6, or 7) by Executive, including recovery of damages from Executive and forfeiture of any and all Salary Severance.

(c)     A court may, but shall not be required to, award the prevailing party in any action to enforce the terms of this Agreement its reasonable attorneys' fees and legal costs in any such action.

**9.    EXECUTIVE'S REPRESENTATIONS**.  Executive hereby represents and warrants to the Company that (a) the execution, delivery and performance of this Agreement by Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which Executive is bound, (b) Executive is not a party to or bound by any employment agreement or noncompete agreement or confidentiality agreement with any other person or entity that would impact the performance of Executive's duties hereunder and (c) upon the execution and delivery of this Agreement by the Executive, this Agreement shall be a legal, valid and binding obligation of Executive, enforceable in accordance with its terms.  Executive hereby acknowledges and represents that Executive has consulted with independent legal counsel regarding Executive's rights and obligations under this Agreement and that Executive fully understands the terms and conditions contained herein.

**10.    MISCELLANEOUS**.

(a)     Survival.  Paragraphs 5 through 10 shall survive and continue in full force and effect notwithstanding the termination of the Employment Period and this Agreement.

(b)     Notices.  Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, sent by reputable overnight courier service or mailed by first class mail, return receipt requested, to the recipient at the address below indicated:

10

Notices to Executive: At the last address on file with the Company.

With a copy (which shall not constitute notice) to:

Holland & Knight LLP
3 Park Plaza - Suite 1400
Irvine, California 92614
Attention:  Bryan S. Gadol
E-mail:  bryan.gadol@hklaw.com

Notices to the Company:

Board of Directors
Lugano Diamonds & Jewelry, Inc.
610 Newport Center Drive, Suite 950
Newport Beach, CA 92660

With a copy (which shall not constitute notice) to:

Mr. Raj Dalal, Principal
Compass Group Management LLC
301 Riverside Avenue, Second Floor
Westport, CT 06880

With a copy (which shall not constitute notice) to:

Gibson, Dunn & Crutcher LLP
3161 Michelson Drive
Irvine, California 92612
Attention:  John M. Williams; Michelle M. Gourley
E-mail:  jwilliams@gibsondunn.com; mgourley@gibsondunn.com

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when delivered.

(c)     Complete Agreement.  This Agreement, including the appendices and exhibits attached hereto, embody the complete agreement and understanding between the parties and supersede and preempt all prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way, including all prior employment agreements between the Company and Executive (the "**Prior Employment Agreements**").  For the avoidance of doubt, the entry into this Agreement and the supersedure of the Prior Employment Agreements shall be deemed not to be a termination resulting in any right to severance or similar payments on the part of Executive under any Prior Employment Agreements, and Executive acknowledges and agrees that the rights of Executive hereunder shall be the exclusive rights of Executive in connection with a termination of Executive's employment as of and following the date of this Agreement.  Notwithstanding the foregoing or anything contained in this Agreement to the contrary, this Agreement does not

11

supersede, and is not superseded by, (i) that certain Stock Purchase Agreement, dated as of September 3, 2021, by and among Lugano Buyer, Inc., Mordechai Haim Ferder, as trustee of the Ferder Family Trust dated 2/24/2009, Edit Fintzi Ferder, as trustee of The RF 2021 Irrevocable Trust dated 8/30/2021, Mordechai Haim Ferder, as trustee of The TF 2021 Irrevocable Trust dated 8/30/2021, Simba IL Holdings, LLC, a Delaware limited liability company, and, solely for the purposes of Article VII and Article VIII set forth therein, Executive, an individual resident of the State of California in his individual capacity; (ii) that certain Stockholders Agreement of Lugano Holding, Inc., dated as of September 3, 2021 by and among Lugano Holding, Inc., Compass Group Diversified Holdings LLC, each of the stockholders listed on the signature page thereto, and any additional holders from time to time a party thereto (as amended and/or restated from time to time) or (iii) that certain Restrictive Covenant Agreement, dated as of September 3, 2021, by and between Lugano Buyer, Inc. and Executive, each of which preceding (i), (ii), and (iii) shall remain in full force and effect and are unaffected by this Agreement.

(d)     No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(e)     Counterparts.  This Agreement may be executed in separate counterparts (including by means of facsimile or portable document format (PDF)), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(f)     Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of the Company and any successor to the Company, including without limitation any persons acquiring directly or indirectly all or substantially all of the business or assets or interests of the Company whether by purchase, merger, consolidation, reorganization or otherwise (in which case, the Company and its successor shall agree to assign this Agreement to such successor), and any such successor shall thereafter be deemed the "**Company**" for purposes of this Agreement.  This Agreement will inure to the benefit of and be enforceable by Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees and legatees, but otherwise will not otherwise be assignable, transferable or delegable by Executive.  This Agreement is personal in nature and neither of the parties hereto shall, without the consent of the other, assign, transfer or delegate this Agreement or any rights or obligations hereunder except as otherwise expressly provided in this paragraph 11(f).

(g)     Choice of Law; Venue.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.  All disputes relating to this Agreement, Executive's employment or other service with the Company or any of its Subsidiaries or affiliates or the termination thereof shall be heard in the state or federal courts located in Orange County, California.

(h)     Amendment and Waiver.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company (as approved by the

12

Board) and Executive, and no course of conduct or course of dealing or failure or delay by any party hereto in enforcing or exercising any of the provisions of this Agreement (including, without limitation, the Company's right to terminate the Employment Period with or without Cause) shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any provision of this Agreement.

(i)    <u>Insurance</u>.  The Company may procure in its own name and for its own benefit life and/or disability insurance on Executive in any amount or amounts considered advisable.  Executive agrees to cooperate in any reasonable medical or other examination, supply any available information and execute and delivery any applications or other instruments in writing as may be reasonably necessary to obtain and maintain such insurance.

(j)    <u>Indemnification</u>.  During and after the Employment Period, the Company shall indemnify (and provide advancement of all expenses to) Executive to the fullest extent permitted by law for all actions and omissions of Executive in the capacity of an officer or director of the Company or any of its Subsidiaries or affiliates (whether before, on or after the Effective Date), and shall provide coverage to Executive under its (and its parent's) directors and officers insurance policy.

(k)    <u>Code Section 409A</u>.  This Agreement is intended to comply with, or be exempt from, Code Section 409A and the parties hereto agree to interpret this Agreement accordingly. To the maximum extent possible, any severance owed under this Agreement shall be construed to fit within the "short-term deferral rule" under Code Section 409A and/or the "two times two year" involuntary separation pay exception under Code Section 409A. If the Executive's termination of employment hereunder does not constitute a "separation from service" within the meaning of Code Section 409A, then any amounts payable hereunder on account of a termination of the Executive's employment and which are subject to Code Section 409A shall not be paid until the Executive has experienced a "separation from service" within the meaning of Code Section 409A. In addition, no reimbursement or in-kind benefit shall be subject to liquidation or exchange for another benefit and the amount available for reimbursement, or in-kind benefits provided, during any calendar year shall not affect the amount available for reimbursement, or in-kind benefits to be provided, in a subsequent calendar year. Any reimbursement to which the Executive is entitled hereunder shall be made no later than the last day of the calendar year immediately following the calendar year in which such expenses were incurred. Each payment payable hereunder shall be treated as a single payment in a series of payments within the meaning of, and for purposes of, Code Section 409A.

(l)    <u>Corporate Opportunity</u>.  All business, commercial and investment opportunities or offers presented to Executive, or of which Executive becomes aware, at any time during the Employment Period which relate to the Tactical Business are referred to herein as "**Corporate Opportunities.**"  Unless approved by the Board, during the Employment Period, Executive shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Executive's own behalf or on behalf of Executive's beneficiaries or immediate family members.

(m)    <u>Executive's Cooperation</u>. During the Employment Period and thereafter, Executive shall cooperate with the Company and its Subsidiaries in (i) any internal investigation or (ii) any administrative, regulatory or judicial proceeding, in each case, as reasonably requested

13

by the Company (including, without limitation, Executive being available to the Company upon reasonable notice for interviews and factual investigations and appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, all at times and on schedules that do not unreasonably interfere with Executive's other activities and commitments); provided, however, that (a) the cooperation and assistance under clause (i) shall not be required after the second anniversary of the date on which Executive's employment with the Company terminates, (b) all cooperation and assistance under this Section 10(m) shall be provided over the phone, by email or by video conferencing unless absolutely necessary to be provided in person and (c) the cooperation and assistance under this Section 10(m) shall not take up a material amount of Executive's time. The Company shall reimburse Executive for any reasonable out of pocket expenses incurred in connection with such cooperation.

* * * * *

14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

COMPANY
LUGANO DIAMONDS & JEWELRY, INC.

By: _Scott Sussman_____
Name: Scott Sussman
Title:   Chief Financial Officer

*Signature Page to Employment Agreement*

EXECUTIVE:

Mordechai Haim Ferder

*[Signature Page to Employment Agreement]*

Exhibit A

**LUGANO DIAMONDS & JEWELRY, INC.,**
**INCENTIVE BONUS PLAN**

This Incentive Bonus Plan (hereinafter, the "Plan") is provided to employees at the discretion of Lugano Diamonds & Jewelry Inc., a California corporation (the "Company").

**Purpose:** This Plan is designed to reward the participating employees of the Company for attainment by the Company of its established financial performance objectives. The Plan is intended to motivate Participants toward even higher achievement and business results and to link Participants' goals and interests more closely with those of the Company and its shareholders.

**Eligibility and Participation:** All employees who satisfy the following criteria (each a "Participant" and collectively, "Participants") shall be eligible to participate in the Plan:

1. Employees who are invited by the Company to participate in the Plan and timely execute and deliver a Participation Notice or who have entered into an employment agreement with the Company that states that such Employee will be eligible to participate in the Plan; and

2. Employees who are employed by the Company during the Plan Year.

**Plan Year:** The fiscal year of the Plan (the "Plan Year") shall be the annual twelve-month period that coincides with the Company's budget year, commencing on January 1 and ending on December 31.

**Performance Objectives**: Participants will be eligible to receive an annual bonus award based on the achievement of certain EBITDA targets by the Company (the "Payout Percentage").   If the Company achieves its Target EBITDA during any Plan Year, then the Payout Percentage shall be 100% and each Participant shall receive a bonus award equal to the Target Bonus amount established for each such Participant and set forth in such Participant's Participation Notice or, if applicable, employment agreement with the Company (the "Bonus Award"). If the Company's actual results deviate from the established Target EBITDA for a Plan Year, then the Payout Percentage will be adjusted in accordance with the schedule set forth on Exhibit A attached hereto, and the Bonus Award payable to each Participant shall be equal to the product of (i) such Participant's Target Bonus, times (ii) the Payout Percentage for such Plan Year.

If the Company's actual EBITDA during any Plan Year is at or below ninety-five (95%) percent of Target EBITDA, the Payout Percentage shall be 0% and Participants will not be eligible to receive a Bonus Award.  The maximum Payout Percentage hereunder is fixed at 160%.  For the avoidance of doubt, no additional Bonus Award shall be due and owing hereunder to the extent the Company exceeds one-hundred and forty (140%) percent of Target EBITDA for any Plan Year.

**Final Award Determinations:** Bonus Awards shall be computed for each Participant by the Company, and subject to the approval of the Compensation Committee of the Board of Directors of the Company (the "Compensation Committee"). Each individual Bonus Award shall be based upon:

(a) the Participant's Target Bonus for the applicable Plan Year, as set forth in the Participant's Participation Notice or, if applicable, employment agreement with the Company
*multiplied by*

(b) the Payout Percentage for the applicable Plan Year.

The Company's calculation and determination of the Payout Percentage for any Plan Year, and the Bonus Award due any Participant in any Plan Year shall be subject to the ratification and approval of the Compensation Committee, and shall be final, conclusive, and binding.

**Payment of Bonus Award**: Subject to terms of the Plan and the applicable Participant Notice or, if applicable, employment agreement with the Company, approved Bonus Awards, if any, shall be payable by the Company to each Participant in a lump sum cash payment, less applicable deductions and withholdings, as soon as practicable after the end of each Plan Year and after the Compensation Committee has determined and the Chief Financial Officer has certified in writing, the Company's EBITDA for such Plan Year.  In order to be paid a Bonus Award with respect to a Plan Year, a Participant must be employed by the Company at the time that Bonus Awards are paid to Participants with respect to such Plan Year; provided, however, in the Compensation Committee's sole discretion, the Company shall be entitled to pay to a Participant a Bonus Award for a year that has already ended if Participant's employment with the Company ceases after the end of such year, but before such payment date (and provided further that an employment agreement may require the payment of a Bonus Award regardless of the Participant's employment with the Company on the payment date).  In no event shall the payment date for a Bonus Award occur later than December 31 of the year following the Plan Year during which such Bonus Award was earned.

**Adjustment of Performance Goals.** The Company, subject to the approval of the Compensation Committee, shall have the right to adjust the Target EBITDA goals and corresponding Payout Percentages (either up or down) during a Plan Year if it is determined that external changes or other unanticipated business conditions have materially affected the fairness of the goals and have unduly influenced the Company's ability to meet them.

**Amendment or Termination of the Plan.** The Company, subject to the approval of the Compensation Committee, shall have complete and exclusive power and authority to amend, modify, suspend, revoke, or terminate the Plan or any Participation Notice issued hereunder in any or all respects, with or without notice and without any Participant's consent at any time or from time to time.  Notwithstanding the foregoing, any amendment, modification, suspension, revocation or termination of any of the terms of participation in the Plan set forth in an employment agreement shall require the prior written consent of the Participant who has entered into such employment agreement with the Company.

**Notices.** Upon any amendment to or modification, suspension, revocation, or termination of the Plan or any Participation Notice by the Company, the Company shall notify the Participant or Participants, as applicable, in writing of such amendment, modification, suspension, revocations, or termination.

**Impact on Other Benefits; No Entitlements.** Compensation paid pursuant to the Plan to a Participant is intended to have no impact on any other employee benefit plans with respect to the Participant except to the extent specifically provided under the terms of any such employee benefit plan or compensatory arrangement or as required under applicable law. The granting of a Bonus Award to any Participant shall not entitle that Participant to receive any future Bonus Awards or to receive any additional Bonus Awards on terms equivalent to or no less favorable than the terms of any preceding Bonus Award to such Participant.

**No Entitlement to Future Employment.** A Participant's participation in the Plan shall not provide any guarantee, promise, or entitlement to continued employment by the Company, and the Company retains the right to terminate the employment of any Participant at any time, with or without cause, for any reason or no reason, except as restricted by law or contract. Nothing contained herein and no actions taken by the Company shall be construed as or interpreted to create a contract of employment between the Participant and the Company.

**Limitation on Transferability and Assignment.** A Participant's rights under the Plan and any Participation Notice are personal to the Participant, may not be transferred by the Participant, and any attempt to do so shall be void, *ab initio*. The Company may, in its sole discretion and without the consent of any Participant, assign the Plan and any Participation Notice at any time.

**Overpayment.** If, for any reason, any compensation is erroneously paid pursuant to the Plan to a Participant, the Participant shall be responsible for refunding the overpayment to the Company. The refund shall be a lump sum payment, a reduction of the amount of future benefits otherwise payable or any other method as the Company, in its sole discretion, may require, subject to applicable law (including Section 409A of the Internal Revenue Code of 1986, as amended). Any amount paid in error to a Participant does not create a legally binding right of the Participant to retain such payment.

**Tax Withholding.** The obligation to pay a Bonus Award to any Participant shall be subject to the right of the Company to make adequate provision for the amounts, if any, required to be withheld or deducted under all applicable international, federal, state, local, and other tax laws.

**Choice of Law.** This Plan and all related Participation Notices shall be governed by and construed in accordance with the laws of the State of California without regard to conflict of laws principles.

**Headings and Severability.** The headings in the Plan are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof. If any provision of the Plan (or portion thereof, including any Participation Notice) is held to be invalid, illegal or unenforceable by any court or arbitrator of competent jurisdiction, then solely as to such jurisdiction and subject to this Section, that provision will be limited ("blue-penciled") to the

minimum extent necessary so that the Plan or the Participation Notice, as applicable, will otherwise remain enforceable in full force and effect in such jurisdiction and without affecting in any way the enforceability of the Plan or the Participation Notice, as applicable, in other jurisdictions. To the extent such provision cannot be so modified, the offending provision will, solely as to such jurisdiction, be deemed severable from the remainder of the Plan or the Participation Notice, as applicable, and the remaining provisions contained in the Plan or the Participation Notice, as applicable, will be construed to preserve to the maximum permissible extent the intent and purposes of the Plan or the Participation Notice, as applicable, in such jurisdiction and without affecting in any way the enforceability of the Plan or the Participation Notice, as applicable, in other jurisdictions.

**Miscellaneous.** Except as set forth otherwise in the Plan, no provision of the Plan or any Participation Notice may be waived except by an instrument in writing signed by the party sought to be charged with the waiver. The waiver by a party of any provisions of the Plan or any Participation Notice shall not constitute a waiver of any other provision of the Plan or the Participation Notice, as applicable. The Plan and all outstanding Participation Notices shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns. Each Participation Notice is for the sole benefit of the Participant and the Company.

**Definitions:**

**Target EBITDA** means for each Plan Year, the EBITDA set forth in the operating budget of the Company, as approved by the Company's Board of Directors, for that Plan Year.

**EBITDA** means the earnings before interest, taxes, depreciation and amortization of the Company, calculated in accordance with generally accepted accounting principles applied on a consistent basis; provided that any management fees paid to Compass Group Management LLC or any affiliate thereof and deducted from the calculation of EBITDA in accordance with generally accepted accounting principles shall be disregarded and added back to EBITDA for purposes of this Plan.  All determinations of EBITDA shall be derived from the Company's annual audited financial statements and determined by the Compensation Committee, whose determination shall be conclusive and final.

**Participation Notice** means the written notice, in form and substance approved by the Company in its sole discretion, whereby the Participant is notified of (i) the Participant's eligibility to participate in the Plan, subject to the terms and conditions of the Plan, (ii) the Participant's Target Bonus amount applicable to Participant, and (iii) any other terms applicable to the Participant that are not set forth in the Plan. Each Participation Notice shall be incorporated herein by reference. The terms of any Participation Notice under which any Participant participates in the Plan may be different from the terms of any other Participation Notice under which any other Participant participates in the Plan, as determined in the sole discretion of the Company.

**LUGANO DIAMONDS & JEWELRY, INC.,**
**INCENTIVE BONUS PLAN**
**Exhibit A**

| EBITDA % of Target | |
|---|---|
| Budget | Payout % |
| No bonus at or below 95% of budget | |
| 95% | 70.0% |
| 96% | 76.0% |
| 97% | 82.0% |
| 98% | 88.0% |
| 99% | 94.0% |
| 100% | 100.0% |
| 104% | 106.0% |
| 108% | 112.0% |
| 112% | 118.0% |
| 116% | 124.0% |
| 120% | 130.0% |
| 124% | 136.0% |
| 128% | 142.0% |
| 132% | 148.0% |
| 136% | 154.0% |
| 140% | 160.0% |
| Max bonus at 140% or greater of budget | |

The bonus will be determined on a straight line basis for performance between targets (e.g., if EBITDA is 138% of budget, then the bonus would be 157% of the Target Bonus).

Exhibit B

## LIMITED EXCLUSION NOTIFICATION

THIS IS TO NOTIFY you, in accordance with Section 2872 of the California Labor Code, that the obligations set forth in this Section 7 do not apply to an invention that you developed entirely on your own time without using the Company's equipment, supplies, facilities, or trade secret information unless the invention either:  (1) relates at the time of conception or reduction to practice of the invention to the Company's business, or action or demonstrably anticipated research or development of the Company; or (2) results from any work performed by you for the Company.  To the extent a provision in this Section 7 purports to require you to assign an invention otherwise excluded from this paragraph, the provision is against the public policy of California and is unenforceable.  However, this limited exclusion does not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

You must disclose on <u>Exhibit C</u> all inventions that have been developed by you, whether solely or jointly with others, for the purpose of determining the parties' respective rights to the invention.  Moreover, during the course of your employment with the Company, you must promptly disclose all inventions developed by you, whether solely or jointly with others, for the purpose of determining the parties' respective rights to the invention.

Exhibit C

List of Inventions

None

Schedule A

List of Activities

Board member of Anderson Ranch

Board member of AFI

Board member of the Performing Arts Center (in Orange County, California)

Board member Lupus Research Alliance

ACB - a real estate company

**Addendum D**

Ferder reserves the right to amend or supplement this proof of claim, including, without limitation, the right to (i) add documents; (ii) assert claims for damages, including, without limitation, for past, present and/or future damages arising from the Diamond contracts, payments made on account of claims against the Debtors,  claims arising from his employment, breaches of his employment agreement and/or for damages arising from the rejection of such agreement, as well as indemnity, contribution, or similar rights, claims or defenses; and/or (iii) change priority and fix, increase, or amend in any respect the amounts and claims referred to herein.

Ferder further reserves the right to file additional proofs of claim for additional claims, including, without limitation, claims for administrative expenses and all other claims, at law or in equity, arising prior to, on, or after the Debtors' Petition Date. Ferder reserves the right to amend or supplement this proof of claim if he should deem it necessary and appropriate, for any reason, or for any other purpose for which a proof of claim filed in this case could be amended. Ferder further reserves any and all rights to setoff or recoupment and, if appropriate, may exercise such rights without further order of the Court and without amending this claim. Ferder reserves all rights under his employment agreements or any other contracts or agreements between the parties, as well as under applicable law, and to review and audit records of the Debtors with regard to the calculation of his claim. Ferder does not waive any rights at law or equity or any rights or causes of action that it has or may have against any person, including, but not limited to, the Debtors and their affiliates. Further, Ferder does not consent to jurisdiction of the Bankruptcy Court or District Court with respect to (i) the pending action captioned *Lugano Diamonds and Jewelry, Inc. v. Ferder, et. al.*, Case No. 30-2025-01492210-CU-CO-CJC ("State Court Action") filed by *Plaintiff Lugano Diamonds & Jewelry Inc.*, which action was removed by Plaintiff from the Orange County Superior Court of the State of California and is now pending in the United States District Court, Central District of California, Southern Division, which upon removal was assigned Case No. 8:25-cv-02845-FWS-JDE; (ii) any counterclaims, crossclaims and/or any third-party actions.

The proof of claim is not intended to be, and shall not be construed as: (i) an election of remedies; (ii) an admission as to the jurisdiction of the Bankruptcy Court or District Court and/or a waiver to contest the jurisdiction of the Bankruptcy Court or District Court; (iii) a waiver of the right to trial by jury in this Court or any other court in any proceeding, notwithstanding the designation or not of any matter as a "core proceeding" pursuant to 28 U.S.C. §157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (iv) a waiver or release of Ferder's right to have any and all final orders in any and all non-core matters or proceedings entered only after a de novo review by a United States District Court Judge; (v) a waiver of the right to withdraw the reference with respect to the subject matter of this proof of claim, any objection thereto or other proceeding that may be commenced in these cases against or otherwise involving Ferder; (vi) a waiver or limitation of any rights, remedies, claims, interests or defenses of Ferder in any pending or future motion or other matter in these cases; (vii) a waiver or release of Ferder's rights against any person, entity, or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (viii) a waiver of the right to seek an administrative claim; (ix) a waiver or release of any

CORE/3536099.0002/237243413.1

counterclaims, crossclaims and/or any third-party actions Ferder may have; or (x) a waiver or release of any right of setoff or recoupment that Ferder may hold against Debtors or their affiliates.

Notices regarding this Claim should be sent to Ferder at the address in the proof of claim form and to Ferder's counsel as follows:

REEVES & WEISS LLP
3333 Michelson Dr.
Suite 300
Irvine, CA 92612
Tel No. 714.717.4606
Jeffrey Reeves, Esq. and
Daniel Weiss, Esq.

With Copy to:

STINSON LLP
1901 Avenue of the Stars
Suite 450
Los Angeles, CA 90067-6006
Tel No. 310.730.7020
Sandford L. Frey, Esq. and
Dennette A. Mulvaney, Esq.